

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

XAVIER MAGALLANES,                    )        No. CV 13-5974-PLA
                                      )
                Petitioner,           )
                                      )
        v.                            )        MEMORANDUM DECISION AND ORDER
                                      )
RON BARNES, Warden,                   )
                                      )
                Respondent.           )
_____)

I.

SUMMARY OF PROCEEDINGS

On March 25, 2010, a Los Angeles County Superior Court jury convicted petitioner of two counts of attempted murder (Cal. Penal Code §§ 664/187(a)) and one count of shooting at an occupied motor vehicle (Cal. Penal Code § 246). (Reporter's Transcript ("RT") 2702-05; Clerk's Transcript ("CT") 188-90, 193-95). For each of the attempted murder counts, the jury also found that the offense was willful, deliberate, and premeditated; that petitioner personally used and discharged a firearm (Cal. Penal Code §§ 12022.53(b) & (c)), and that the offense was committed for the benefit of, at the direction of, and in association with a criminal street gang (Cal. Penal Code § 186.22(b)(1)(C)). (RT 2702-05; CT 188-89). The jury also found the gang allegation to be true for the shooting at an occupied motor vehicle violation. (RT 2704-05; CT 190). On May

13, 2010, petitioner was sentenced to state prison for two consecutive life terms plus 40 years. (RT 3011-13; CT 197-201).

Petitioner filed a direct appeal.  On May 23, 2012, the California Court of Appeal affirmed his conviction in an unpublished decision.  (Respondent's Notice of Lodging ("Lodged Document") Nos. 5-8).[1]  Petitioner filed a petition for review in the California Supreme Court, which was summarily denied without citation to authority on August 8, 2012.  (Lodged Document Nos. 9-10).

Petitioner next filed a petition for writ of habeas corpus in the Los Angeles County Superior Court, which was denied on December 19, 2012, for failure to show a prima facie case for relief.  (Lodged Document Nos. 11, 12).  Petitioner then filed a habeas petition in the California Court of Appeal.  (Lodged Document No. 13).  That petition was denied on March 25, 2013, "for failure to state sufficient facts demonstrating entitlement to the relief requested," and with citations to People v. Duvall, 9 Cal. 4th 464, 474-75, 37 Cal. Rptr. 2d 259, 886 P.2d 1252 (1995); In re Lindley, 29 Cal. 2d 709, 723 (1947); and In re Clark, 5 Cal. 4th 750, 765, 21 Cal. Rptr. 2d 509 (1993).  (Lodged Document No. 14).  Finally, petitioner filed a habeas petition in the California Supreme Court, which was summarily denied without citation to authority on June 12, 2013.  (Lodged Document Nos. 15, 16).

On July 18, 2013, petitioner filed a Petition for Writ of Habeas Corpus by a Person in State Custody ("Petition") herein, and he later consented to have the undersigned Magistrate Judge conduct all further proceedings in this matter.  Respondent also consented to have the undersigned Magistrate Judge conduct all further proceedings.  Following several extensions of time, respondent filed an Answer and Return ("Answer") on February 26, 2014.  (See Docket No. 29).  Following two requests for extensions of time, petitioner filed a Response ("Traverse")

---

[1]   The Court of Appeal affirmed the judgment but remanded the case for re-sentencing because the record did not clearly show that the trial court recognized it had discretion to impose a concurrent, rather than consecutive, sentence for the second count of attempted murder, as well as to impose some additional fees and assessments.  (Lodged Document No. 8 at 12-13).  At a re-sentencing hearing on August 1, 2012, petitioner was again sentenced to two consecutive life terms plus 40 years.  (Lodged Document No. 12).

thereto on May 27, 2014 (Docket No. 38), along with an "Exhibit" on May 30, 2014 (Docket No. 39).

This matter has been taken under submission, and is ready for decision.

## II.

## STATEMENT OF FACTS

The Court adopts the following factual summary set forth in the California Court of Appeal's Opinion affirming petitioner's conviction:

### A.  *Prosecution Case*

Eric Silva testified that on June 7, 2009, at about 11:30 p.m., he was driving his Oldsmobile Cutlass in Lynwood.  His friend, Jose Velasquez, was a passenger in the vehicle.  After stopping at an intersection, Velasquez noticed another Oldsmobile approaching the intersection and told Silva, "Check it out, it is a car like yours."  Silva continued to his destination, and the other vehicle began following.  After a while, Silva noticed the other vehicle was still following.  As he turned left onto a school road, the other vehicle sped up and pulled alongside Silva's vehicle.  Both vehicles were in an area illuminated by a street light.

Silva testified that [petitioner] was driving the other vehicle -- a silver-gray Oldsmobile Cutlass.  There was also a passenger in [petitioner]'s car. Silva further testified that after [petitioner] had pulled alongside him, [petitioner] asked, "Where you guys from?"  Silva responded, "What do you mean? … I don't bang." [Petitioner] then stated, "You guys tuna fish. You guys tuna fish." Silva repeated that he did not bang. [Petitioner] then stated, "This is my block. This is my block." Silva responded, "Cool. You know what?  I don't bang.  So keep on banging the block.  I don't do bang." [Petitioner] again said, "Tuna fish."  Silva understood "tuna fish" to be a derogatory term for members of the Tortilla Flats gang.

Silva testified that [petitioner] continued saying "Tuna fish," and Silva continued to reply, "No." [Petitioner] then pulled out a revolver with his left hand, and pointed it at Velasquez.  In response, Silva immediately stepped on his accelerator and drove away.  As Silva did so, [petitioner] fired four shots.  Silva testified he drove without stopping until he reached a friend's house.

Silva's friend called the police.  Silva noticed there were several bullet holes in his car, including one in the windshield and another in the rear quarter panel.  Silva testified he was present when a deputy sheriff recovered a bullet from the trunk of his car.

Silva also testified that a few days after the shooting, he identified [petitioner] from a photographic six-pack.  Silva further testified that he was shown some photographs of a car, and that he identified that car as the one [petitioner] was driving.  Silva noted that [petitioner] drove a rare type of car.  Silva knew that it was a rare car because "I know those type[s] of cars.  I am a car person, that is what I do."

Silva's passenger, Velasquez, also testified at trial, providing testimony consistent with Silva's.  Velasquez testified that [petitioner] pulled out a chrome .38 revolver and pointed it at his face.  Velasquez identified [petitioner] as the shooter in court, and testified that he had previously identified [petitioner] from a photographic six-pack.

Deputy Sheriff Marc Antrim testified that he made a traffic stop of [petitioner] on June 10, 2009.  [Petitioner] was driving a silver Oldsmobile Cutlass; the deputy took some photographs of the vehicle.  Deputy Antrim also testified that he conducted a field interview of [petitioner] during the encounter.  [Petitioner] "self-admitted" he was an El Segundo gang member with the moniker "X-Man." [Petitioner] also had a tattoo on his back consistent with membership in the El Segundo gang.

Detective Ben Torres testified that on August 5, 2009, [petitioner] was arrested, and his home was searched after [petitioner] and his mother consented.  During the search, officers recovered a speedloader for a revolver handgun and some ammunition, including a .380-caliber bullet.

Senior criminalist Tracey Peck, a firearms examiner, testified she examined the bullet recovered from Silva's car.  She determined that the fired bullet was consistent with the type of bullet commonly loaded into .380 auto caliber cartridges. Peck also stated that that [sic] it was possible to load and use automatic bullets in a revolver.

Detective Patrick Escamilla testified as a gang expert regarding the Lynwood El Segundo 13 and Tortilla Flats gangs.  Detective Escamilla testified that the two gangs were rivals and had members living in parts of Lynwood.  Detective Escamilla opined that Silva and Velasquez were not members of the Tortilla Flats gang.

Detective Hugo Reynaga also testified as a gang expert.  Detective Reynaga opined that [petitioner] was a Lynwood El Segundo 13 gang member based upon [petitioner]'s admissions, and other indicia of gang membership, such as associating with two admitted gang members.  After being presented with a hypothetical situation that mirrored the evidence in the instant case, Detective Reynaga opined that the shootings were committed for the benefit of a criminal street gang.

**B.**    ***Defense Case***

Marina Elbadry, [petitioner]'s mother, testified that [petitioner] was right-handed.  She also testified that at the time of the incident,

[petitioner] was on a school vacation.  She stated that [petitioner] was not a gang member.

(Lodged Document No. 8 at 3-5).

### III.

### PETITIONER'S CONTENTIONS

1.     Petitioner was denied his Sixth Amendment right to the assistance of counsel of his choice when the trial court refused to allow him to discharge his retained attorney.  (Petition at 5-6).

2.     Petitioner received ineffective assistance of trial counsel.  (Petition at 5-6).

3.     Petitioner's sentence constituted cruel and unusual punishment because the evidence presented at trial was insufficient to support his convictions for attempted murder, petitioner had no prior criminal record, and the victims were not injured.  (Petition at 7-8).

4.     Petitioner was denied his right to present a defense because the police impounded his car and sold it at auction before his trial, preventing him from collecting any exculpatory evidence.  (Petition at 7-8).

5.     The prosecutor committed misconduct by arresting petitioner's defense witnesses before trial.  (Petition at 9).

### IV.

### STANDARD OF REVIEW

The Petition was filed after the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 ("the AEDPA").  Pub. L. No. 104-132, 110 Stat. 1214 (1996).  Therefore, the Court applies the AEDPA in its review of this action.  See Lindh v. Murphy, 521 U.S. 320, 336, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997).

Under the AEDPA, a federal court may not grant a writ of habeas corpus on behalf of a person in state custody "with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim (1) resulted in a decision that was contrary to,

1   or involved an unreasonable application of, clearly established Federal law, as determined by the

2   Supreme Court of the United States; or (2) resulted in a decision that was based on an

3   unreasonable determination of the facts in light of the evidence presented in the State court

4   proceeding."  28 U.S.C. § 2254(d).  As explained by the Supreme Court, section 2254(d)(1)

5   "places a new constraint on the power of a federal habeas court to grant a state prisoner's

6   application for a writ of habeas corpus with respect to claims adjudicated on the merits in state

7   court."  Williams v. Taylor, 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389  (2000).  In

8   Williams, the Court held that:

9           Under the "contrary to" clause, a federal habeas court may grant the
            writ if the state court arrives at a conclusion opposite to that reached
10          by this Court on a question of law or if the state court decides a case
            differently than this Court has on a set of materially indistinguishable
11          facts.  Under the "unreasonable application" clause, a federal habeas
            court may grant the writ if the state court identifies the correct
12          governing legal principle from this Court's decisions but unreasonably
            applies that principle to the facts of the prisoner's case.

13

14   Williams, 529 U.S. at 412-13; see Weighall v. Middle, 215 F.3d 1058, 1061-62 (9th Cir. 2000)

15   (discussing Williams).  A federal court making the "unreasonable application" inquiry asks "whether

16   the state court's application of clearly established federal law was objectively unreasonable."

17   Williams, 529 U.S. at 409; Weighall, 215 F.3d at 1062.  The Williams Court explained that "a

18   federal habeas court may not issue the writ simply because that court concludes in its independent

19   judgment that the relevant state-court decision applied clearly established federal law erroneously

20   or incorrectly.  Rather, that application must also be unreasonable."  Williams, 529 U.S. at 411;

21   accord: Lockyer v. Andrade, 538 U.S. 63, 123 S.Ct. 1166, 1175, 155 L.Ed.2d 144 (2003).  Section

22   2254(d)(1) imposes a "highly deferential standard for evaluating state-court rulings," Lindh, 521

23   U.S. at 333 n. 7, and "demands that state court decisions be given the benefit of the doubt."

24   Woodford v. Visciotti, 537 U.S. 19, 123 S.Ct. 357, 360, 154 L.Ed.2d 279 (2002) (per curiam).  A

25   federal court may not "substitut[e] its own judgment for that of the state court, in contravention of

26   28 U.S.C. § 2254(d)."  Id.; Early v. Packer, 537 U.S. 3, 123 S.Ct. 362, 366, 154 L.Ed.2d 263

27

28

1  (2002) (per curiam) (holding that habeas relief is not proper where state court decision was only

2  "merely erroneous").

3        The only definitive source of clearly established federal law under the AEDPA is the

4  holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision.

5  Williams, 529 U.S. at 412.   While circuit law may be "persuasive authority" for purposes of

6  determining whether a state court decision is an unreasonable application of Supreme Court law

7  (Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th Cir. 1999)), only the Supreme Court's holdings

8  are binding on the state courts and only those holdings need be reasonably applied. Williams, 529

9  U.S. at 412; Moses v. Payne, 555 F.3d 742, 759 (9th Cir. 2009).   Furthermore, under 28 U.S.C.

10  § 2254(e)(1), factual determinations by a state court "shall be presumed to be correct" unless the

11  petitioner rebuts the presumption "by clear and convincing evidence."

12        A federal habeas court conducting an analysis under § 2254(d) "must determine what

13  arguments or theories supported, or, [in the case of an unexplained denial on the merits], could

14  have supported, the state court's decision; and then it must ask whether it is possible fairminded

15  jurists could disagree that those arguments or theories are inconsistent with the holding in a prior

16  decision of [the Supreme Court]." Harrington v. Richter, 562 U.S. 86, 131 S. Ct. 770, 786, 178

17  L.Ed.2d 624 (2011) ("A state court's determination that a claim lacks merit precludes federal

18  habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's

19  decision.").   In other words, to obtain habeas relief from a federal court, "a state prisoner must

20  show that the state court's ruling on the claim being presented in federal court was so lacking in

21  justification that there was an error well understood and comprehended in existing law beyond any

22  possibility for fairminded disagreement." Id. at 786-87.

23        The United States Supreme Court has held that "[w]here there has been one reasoned

24  state judgment rejecting a federal claim, later unexplained orders upholding that judgment or

25  rejecting the same claim rest upon the same ground." Ylst v. Nunnemaker, 501 U.S. 797, 803,

26  111 S.Ct. 2590, 115 L.Ed.2d 706 (1991).  Here, petitioner presented Ground One on appeal to the

27  California Court of Appeal, which issued a reasoned opinion rejecting the claim.  (See Lodgment

28  No. 8).  Thereafter, the California Supreme Court summarily denied this claim.  (See Lodgment

Nos. 9-10).  Accordingly, this Court reviews the California Court of Appeal's reasoned opinion rejecting Ground One under AEDPA's deferential standard.  See Ylst, 501 U.S. at 803; Shackleford v. Hubbard, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000) (district court "look[s] through" unexplained California Supreme Court decision to the last reasoned decision as the basis for the state court's judgment).

Petitioner presented the remaining claims (Grounds Two through Five) in his state habeas petitions filed in the California courts.  The Los Angeles County Superior Court rejected the claims, finding "no prima facie case for relief."  (Lodged Document No. 12 at 3).  Similarly, the California Court of Appeal denied the claims because petitioner had not "state[d] sufficient facts demonstrating entitlement to the relief requested."  (Lodged Document No. 14).  Finally, the claims were summarily denied by the Supreme Court.  (Lodged Document No. 16).  Because no state court issued a reasoned decision rejecting petitioner's Grounds Two through Five, this Court must determine what arguments or theories could have supported the rejection of petitioner's claims, and then assess reasonableness by asking "whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme Court]."  Richter, 131 S.Ct. at 786.

**V.**

**DISCUSSION**

**GROUND ONE**:     **COUNSEL OF CHOICE**

In Ground One, petitioner claims that he was denied his Sixth Amendment right to the assistance of counsel of his choice when the trial court refused to allow him to discharge his retained attorney and hire new counsel.  (Petition at 5-6; Traverse at 6-13).

**A.     The California Court of Appeal's Opinion**

The California Court of Appeal set forth the relevant facts as follows:

> [Petitioner] was represented by private counsel, John Goalwin, at the preliminary hearing and at subsequent hearings in 2009.  On February 25, 2010, [petitioner] appeared with Mr. Goalwin.  The minute order for the hearing stated: "Per stipulation of all parties, the matter is set for jury trial for ... 03/09/10."  Nothing in the appellate

record suggests [petitioner] raised any objection to Mr. Goalwin's representation.

On March 8, 2010, the day before trial, attorney Brian Michaels filed a notice of motion and motion for continuance and a motion to substitute as attorney of record. In the declaration filed in support of the motion, Mr. Michaels stated that "[d]uring the week of February 19, 2010," [petitioner] asked him to represent [petitioner] in the instant matter. Michaels further stated that he tried to get the case files and an accounting of fees from Mr. Goalwin, but was unsuccessful. The declaration then stated: "[Petitioner]'s family signed a contract to retain my office to represent [petitioner] at the last appearance in this matter. I received a call that they decided to stay with their current lawyer at the 11th hour. I assumed my contact with [petitioner] and his family [was] now done. It was not. I received a call on [Thursday] 3/4/10 from [petitioner]'s family once again indicating they no longer wanted to go on with Mr. Goalwin and would I take the case. They indicated Mr. Goalwin's failure to return unearned fees is what caused the delay and the timing of the call." The declaration further stated: "As of March 5, 2010 I was not retained but may be retained on Monday[, March 8, 2010]." Later, the declaration stated: "Today, March 8, ... [petitioner] confirmed his personal desire to have our firm [s]ubstitute in as attorney of record. On information and belief the long delay was brought about by current counsel's failure to account for and return all unearned fees."

The motion for a continuance and substitution of new attorney of record was noticed for the first day of trial, March 9, 2010, at 8:30 a.m., before Judge John J. Cheroske. On March 9, [petitioner] and Mr. Goalwin appeared before Judge Cheroske. Mr. Goalwin informed the court that when he visited [petitioner] in county jail yesterday, "I was informed by [petitioner] that he did not want me to represent him anymore. He retained another attorney." Mr. Goalwin also stated that when he arrived at his office that morning, "there was an email that was sent to me Sunday night [March 7, 2010] from attorney Brian Michaels saying he was going to take the case. Apparently he filed a [motion for a continuance under Penal Code section] 1050."[2]

The trial court asked if Mr. Michaels was present, but there was no response. The court then asked the prosecution if it was ready, and the prosecutor responded in the affirmative. The court stated the matter had been pending for eight months, and that the trial had been continued six times.[3] The court further stated, "I received a request in writing from Brian Michaels to 1: substitute in to the case and 2: to continue the case and most importantly, he's not even here. So his request is denied. It's untimely anyway. And in my opinion, it will just be another unnecessary delay." The court transferred the matter for trial before the Honorable Patrick Connolly.

_____

[2]   The motion was not filed until Monday, March 8.

[3]   [Petitioner] disputes the court's figures, but acknowledges that the case had been pending for more than six months and that multiple continuances had been granted.

1

2

3

4

5

6

7

           When the parties appeared before Judge Connolly, Mr. Michaels was present, and asked that the previously denied motion for substitution be "reviewed."  Judge Connolly stated: "Mr. Goalwin announced ready....  This was sent here for trial.  This motion regardless of whether or not Mr. Michaels was present was heard by [Judge Cheroske].  There is nothing that I have heard that would ... lead me to believe that there is anything different except for this, Mr. Michaels, are you ready to go to trial today?"  Mr. Michaels stated, "Absolutely not."  The court denied the motion to substitute counsel, and stated that trial would commence that day with Mr. Goalwin.  The court declined to hear from [petitioner] at that time, but later, the court heard from [petitioner] "in the framework of a Marsden[4] [hearing]."

8

(Lodged Document No. 8 at 6-8 (footnotes in original)).

9

10

      The state appellate court found that the trial court did not violate petitioner's constitutional rights in denying the change of attorneys or the motion for a continuance:

11

12

13

14

15

           Under the Sixth Amendment of the federal constitution, a criminal defendant has the right to be represented by counsel at all critical stages of the prosecution.  (Faretta v. California (1975) 422 U.S. 806, 818-819.)  The right to effective assistance of counsel includes the right to appear with retained counsel of one's choice.  (People v. Gzikowski (1982) 32 Cal.3d 580, 586.)  A court, however, may deny a motion for a continuance to obtain new counsel if the motion was made for the purpose of delaying trial, was untimely, or would impair efficient judicial administration.  (Ibid.)

16

17

18

19

20

21

22

23

24

25

26

27

           After reviewing the record, we find no abuse of discretion in the denial of [petitioner's] motion for a continuance and to substitute a new attorney of record.  (People v. Courts (1985) 37 Cal.3d 784, 790, citing Ungar v. Sarafite (1964) 376 U.S. 575, 589 [granting of a continuance is within discretion of the trial court].)  First, the motion was untimely, as it was noticed for the first day of trial.  (See, e.g., People v. Lau (1986) 177 Cal.App.3d 473, 479 [trial court did not abuse its discretion in denying defendant's request to replace attorney made right before jury selection]; see also People v. Courts, supra, 37 Cal.3d at p. 792, fn. 4 [citing cases where the lateness of continuance requests made on "the eve-of-trial, day-of-trial, and second-day-of-trial" was a significant factor justifying denial of motion].)  In addition, Judge Cheroske acted within his discretion to deny [petitioner's] motion because Mr. Michaels was not even present when the motion was to be heard and, according to his declaration, was seeking not only a substitution, but a continuance.  Similarly, Judge Connolly did not abuse his discretion in denying the renewed motion for a substitution because there was no change in the factual circumstances, except an affirmation from Mr. Michaels that he was not ready to try the case.  There can be no dispute that the granting of the motion would have delayed the trial yet again and thus impaired the efficient administration of justice.  (See People v. Keshishian

28

     4   People v. Marsden (1970) 2 Cal.3d 118 (Marsden).

(2008) 162 Cal.App.4th 425, 428 [fair opportunity to secure counsel of choice is necessarily limited by the countervailing state interest in proceeding with prosecutions on an orderly and expeditious basis, """taking into account the practical difficulties of 'assembling the witnesses, lawyers, and jurors at the same place at the same time"""].)

[Petitioner] contends on appeal that the untimeliness of his request was due to attorney Goalwin's failure to bring to the court's attention [petitioner's] desire to retain new counsel. He suggests Mr. Goalwin should have notified the court about [petitioner's] desire to retain new counsel at the February 25 hearing. The record indicates, however, that as of that date [petitioner] had decided to continue with Mr. Goalwin. In Mr. Michaels' declaration, he stated he had initially been retained by [petitioner's] family to represent [petitioner] at the February 25, 2010 hearing, but at the "11th hour," had received a call from the family that they were staying with their current attorney. In addition, the record shows that [petitioner] was present at the February 25, 2010 hearing, but nothing in the record suggests he raised the issue of obtaining new counsel. In short, [petitioner] has failed to show he could not have retained new counsel in a timely fashion or was prevented from bringing to the court's attention his desire to do so. (Compare People v. Blake (1980) 105 Cal.App.3d 619, 623-625 [where defendant had reasonable opportunity to obtain counsel of his choice but failed to do so until on or after commencement of trial, trial court did not abuse its discretion in denying continuance] with People v. Courts, supra, 37 Cal.3d at pp. 791-796 [where defendant, more than a week before trial, requested a continuance to retain private counsel, retained counsel five days before trial, and sought to have matter heard several days prior to trial, court erred in denying continuance].)

(Lodged Document No. 8 at 8-10).

## B. Federal Law and Analysis

Under the Sixth Amendment, criminal defendants who can afford to retain counsel have a qualified right to obtain counsel of their choice. Wheat v. United States, 486 U.S. 153, 159, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988). "[W]hile the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." Id.

Additionally, the Supreme Court has held that a trial court has broad discretion in determining whether to allow a continuance in a criminal case. See Ungar v. Sarafite, 376 U.S. 575, 589, 84 S.Ct. 841, 11 L.Ed.2d 921 (1964); see also Morris v. Slappy, 461 U.S. 1, 11, 103 S.Ct. 1610, 75 L.Ed.2d 610 (1983) ("Trial judges necessarily require a great deal of latitude in

scheduling trials.  Not the least of their problems is that of assembling the witnesses, lawyers, and jurors at the same place at the same time, and this burden counsels against continuances except for compelling reasons.").  A trial court is thus allowed "wide latitude in balancing the right to counsel of choice against the needs of fairness, and against the demands of its calendar." United States v. Gonzalez-Lopez, 548 U.S. 140, 152, 126 S.Ct. 2557, 165 L.Ed.2d 409 (2006) (citation omitted).  Accordingly, trial courts retain the discretion to "make scheduling and other decisions that effectively exclude a defendant's first choice of counsel." Miller v. Blacketter, 525 F.3d 890, 895 (9th Cir. 2008) (quoting Gonzalez-Lopez, 548 U.S. at 152).

Here, petitioner has not made a showing that he was wrongly denied his counsel of choice to represent him at trial.  As explained by the California Court of Appeal, petitioner made the request for substitute counsel after the case had been pending for eight months and on the day his trial was scheduled to begin.  (See CT 90-95; Lodged Document No. 4 at A1-A3).  Attorney Michaels failed to appear at the time the motion was initially heard.  (See Lodged Document No. 4 at A1-A2).  Later, after petitioner's case was assigned to a courtroom to begin trial, Attorney Michaels indicated he was "absolutely not" ready to start trial and, thus, would have needed a continuance of the scheduled trial were he to have been substituted in as petitioner's counsel. (RT 3).  In light of the untimeliness of the request, the trial court reasonably exercised its discretion in denying the motion to substitute counsel.  See, e.g., Wheat, 486 U.S. at 157, 164 (finding no Sixth Amendment violation where defendant moved to substitute his counsel two days before trial); Houston v. Schomig, 533 F.3d 1076, 1079-80 (9th Cir. 2008) (finding that the trial court did not abuse its discretion in denying a motion to substitute counsel made just four days before trial).

As for petitioner's claim that his last-minute request for new counsel was the fault of Attorney Goalwin, the record rebuts any such assertion.  Petitioner made numerous appearances before the trial court, including the February 2010 pre-trial conference date where the trial date was set, without indicating that he wanted to hire new counsel.  (See, e.g., CT 63-66).  Moreover, as is made clear in Attorney Michaels' declaration, petitioner, in fact, wavered on whether he wanted Michaels to represent him at trial and did not ultimately confirm that desire until March 8, 2010, the day before the trial was scheduled to begin.  (CT 96-98).  Based on the foregoing,

petitioner has failed to show that the denial of the motion to substitute counsel was the kind of "unreasoning and arbitrary insistence on expeditiousness that clearly established federal law prohibits." Miller, 525 F.3d at 898 (citing Morris, 461 U.S. at 11-12).  Accordingly, the California Court of Appeal's rejection of this claim was not unreasonable and petitioner is not entitled to relief.

**GROUND TWO:     INEFFECTIVE ASSISTANCE OF COUNSEL**

In Ground Two, petitioner claims that he received ineffective assistance of trial counsel. (Petition at 5-6; Traverse at 13-17).

**A.     Federal Law**

In federal habeas proceedings, the two-step analysis outlined by the Supreme Court in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), governs ineffective assistance claims.  Under Strickland, petitioner first must prove that his attorney's representation fell below an objective standard of reasonableness by identifying the acts or omissions that rendered the representation objectively unreasonable.  Id. at 687-88, 690.  An attorney's performance is deemed deficient if it is objectively unreasonable under prevailing professional norms.  Strickland, 466 U.S. at 687-88; Hughes v. Borg, 898 F.2d 695, 702 (9th Cir. 1990).  Review of counsel's performance is highly deferential, and the petitioner must overcome the strong presumption that counsel's conduct fell within the wide range of reasonable representation.  Strickland, 466 U.S. at 689.  In reviewing a challenge to the effectiveness of trial counsel, the court must make "every effort . . . to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."  Id.

With respect to the second prong of the Strickland analysis, a petitioner must show prejudice by demonstrating a reasonable probability that, but for counsel's error, the result of the proceeding would have been different.  Strickland, 466 U.S. at 694.  A "reasonable probability" is defined as "a probability sufficient to undermine confidence in the outcome."  Strickland, 466 U.S. at 694.  "The likelihood of a different result must be substantial, not just conceivable." Richter, 131 S.Ct. at 792.

Petitioner bears the burden of satisfying both prongs of the Strickland standard.  Strickland, 466 U.S. at 687; Cheney v. Washington, 614 F.3d 987, 995 (9th Cir. 2010).  Moreover, because petitioner must prove both deficient performance and prejudice, a federal court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . .  If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." Strickland, 466 U.S. at 697; Rios v. Rocha, 299 F.3d 796, 805 (9th Cir. 2002) ("Failure to satisfy either prong of the Strickland test obviates the need to consider the other.").

"The standards created by Strickland and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." Premo v. Moore, 562 U.S. 115, 131 S.Ct. 733, 740, 178 L.Ed.2d 649 (2011) (citations omitted).  To succeed on an ineffective assistance of counsel claim governed by § 2254(d)(1), "it is not enough" to persuade a federal court that the Strickland test would be satisfied if the claim "were being analyzed in the first instance." Bell v. Cone, 535 U.S. 685, 698-99, 122 S.Ct. 1843, 1852, 152 L.Ed.2d 914 (2002).  It also "is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied Strickland incorrectly." Id. at 699.  Rather, a petitioner must show that the state court "applied Strickland to the facts of his case in an objectively unreasonable manner." Id. "[B]ecause the Strickland standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." Knowles v. Mirzayance, 556 U.S. 111, 123, 129 S.Ct. 1411, 173 L.Ed.2d 251 (2009).

### B.   Analysis

Here, Petitioner has raised several instances in which he argues that counsel was constitutionally deficient.

First, he claims that counsel was ineffective for failing to notify the trial court in a timely manner that petitioner wished to replace counsel with Attorney Michaels. (Petition at 5-6; Traverse at 14-15).  He argues that counsel's failure to tell the court at the February 25, 2010, pre-trial hearing that petitioner no longer wanted Attorney Goalwin to represent him caused him to be forced to proceed to trial with an attorney that was not his counsel of choice.  As discussed

previously, however, petitioner himself made no mention of his desire to replace counsel in February 2010 when the trial date was set.  (See CT 63-66).  Further, Attorney Michaels' declaration makes clear that petitioner did not ultimately decide he wanted Michaels to represent him at trial until the day before the trial was scheduled to begin, which was far too late.  (See CT 96-98).  Thus, it is not at all clear that, even if petitioner's counsel had informed the court earlier of petitioner's desire to replace him, it would have led to the court granting him new counsel.  Nor has petitioner demonstrated any prejudice from having Attorney Goalwin, rather than Attorney Michaels, represent him at trial.  The evidence against petitioner was overwhelming: both victims identified petitioner in a six-pack photographic lineup and at trial as being the shooter, as well as identifying his car on the night the shots were fired.  (RT 927-28, 939-42, 944-45, 1243-49).  Thus, petitioner has not established that counsel acted deficiently in this regard or that he suffered any prejudice from Attorney Goalwin's representation.

Second, petitioner claims that counsel failed to keep petitioner informed of the status of his case and did not visit petitioner in jail.  (Traverse at 15).  Even assuming that counsel failed to visit petitioner as alleged, and further assuming that such conduct was unreasonable, petitioner cannot show prejudice.  Petitioner has not alleged what information he could have provided to counsel from jail visits that would have aided his defense.  Nor has he explained how a lack of updates on his case impinged upon his defense.  Simply put, petitioner cannot show that there was a reasonable probability of a more favorable result at trial had counsel kept in more regular contact by visiting him in jail.  See, e.g., United States v. Mealy, 851 F.2d 890, 908-09 (7th Cir. 1988) ("[Defendant] fails to explain how the lack of consultation affected the outcome of the trial.  [Defendant's] conclusory allegations regarding the time spent in consultation with his trial counsel do not show that he was prejudiced at trial, and thus his ineffective assistance of counsel claim must fail.").

Next, petitioner claims that counsel was ineffective for failing to hire a licensed investigator rather than relying on his brother, an ex-felon, to investigate his case.  (Petition at 5; Traverse at 16).  This claim is simply too speculative to warrant relief.  Petitioner does not explain how a more experienced investigator would have undermined the substantial amount of inculpatory evidence

1    presented against him.  Nor does he even suggest what evidence could have been -- but was not

2    -- discovered that could have aided his defense.  Speculation about what additional evidence

3    might have been obtained through further investigation is not enough to establish prejudice.  See

4    Ceja v. Stewart, 97 F.3d 1246, 1255 (9th Cir. 1996) (holding that to show prejudice, the petitioner

5    must demonstrate that further investigation would have revealed favorable evidence); see also

6    Hendricks v. Calderon, 70 F.3d 1032, 1042 (9th Cir. 1995) ("Absent an account of what beneficial

7    evidence investigation into any of these issues would have turned up, [petitioner] cannot meet the

8    prejudice prong of the Strickland test.").

9         Finally, petitioner makes vague and conclusory accusations that counsel was unprepared

10   for trial.  Unsupported claims, such as these, cannot merit habeas relief.  See James v. Borg, 24

11   F.3d 20, 26 (9th Cir. 1994) (rejecting ineffective assistance claim on the ground that "[c]onclusory

12   allegations which are not supported by a statement of specific facts do not warrant habeas relief");

13   United States v. Smith, 924 F.2d 889, 896 (9th Cir.1991) ("[U]nsupported and conclusory claims

14   are not sufficient to show error.").  Moreover, petitioner makes no attempt to explain how further

15   preparation from counsel would have affected the outcome of his case.

16        In short, petitioner has not pointed to any instances in which trial counsel performed

17   deficiently under Strickland.  Nor does the Court find any possible prejudice from the alleged

18   deficiencies in light of the overwhelming evidence against petitioner.  See Strickland, 466 U.S. at

19   694.  Accordingly, based on its review of the record, the Court concludes that the state courts'

20   denial of this claim was not contrary to Supreme Court precedent.  Richter, 131 S.Ct. at 786-87.

21   **GROUND THREE:  CRUEL AND UNUSUAL PUNISHMENT**

22        In Ground Three, petitioner claims that his sentence of two life terms plus 40 years

23   constituted cruel and unusual punishment because the evidence presented at trial was insufficient

24   to support his convictions for attempted murder, petitioner had no prior criminal record, and the

25   victims were not injured.[5]  (Petition at 7-8).  He argues that his sentence was disproportionate to

26   _____

27   　　　[5]    Respondent argues that any attempt to raise a subclaim that there was insufficient evidence
     to uphold his convictions is procedurally defaulted.  (See Answer at 25-28).  Petitioner concedes,

28                                                                                            (continued...)

16

other crimes that cause "actual injury" but result in shorter prison sentences.  (Traverse at 19-20).

For purposes of federal habeas review, it is "clearly established" law that "[a] gross disproportionality principle is applicable to sentences for terms of years."  Andrade, 538 U.S. at 72. The principle "does not require strict proportionality between crime and sentence" but "[r]ather, it forbids only extreme sentences that are 'grossly disproportionate' to the crime."  Harmelin v. Michigan, 501 U.S. 957, 993, 1001, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991) (Kennedy, J., concurring); see also Graham v. Florida, 560 U.S. 48, 130 S.Ct. 2011, 2021, 176 L.Ed.2d 825 (2010) ("Embodied in the Constitution's ban on cruel and unusual punishments is the 'precept of justice that punishment for crime should be graduated and proportioned to [the] offense.'").  The Supreme Court has noted, however, that the "precise contours" of the proportionality principle are unclear and "applicable only in the 'exceedingly rare' and 'extreme' case."  Andrade, 538 U.S. at 73 (citation omitted); see also Solem v. Helm, 463 U.S. 277, 289-90, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983) (finding that successful challenges based on proportionality are "exceedingly rare"); Crosby v. Schwartz, 678 F.3d 784, 795 (9th Cir. 2012) ("Circumstances satisfying the gross disproportionality principle are rare and extreme . . . .").

The burden of demonstrating that a sentence is grossly disproportionate to a crime is significant.   As a general rule, a "punishment within legislatively mandated guidelines is presumptively valid."  United States v. Mejia-Mesa, 153 F.3d 925, 930 (9th Cir. 1998); see also United States v. McDougherty, 920 F.2d 569, 576 (9th Cir. 1990) ("Generally, so long as the sentence imposed does not exceed the statutory maximum, it will not be overturned on eighth amendment grounds.").  As the Supreme Court has recognized, "the primary responsibility for defining crimes against state law and fixing punishments for the commission of these crimes . . . rests with the States," although "state laws respecting crimes[ ] [and] punishments . . . are, of course, subject to the overriding provisions of the United States Constitution."   Payne v.

---

[5](...continued)
however, that he did not intend to raise any such subclaim but, rather, his cruel and unusual punishment claim was simply "inartfully pled."  (Traverse at 17).  Accordingly, the Court need not address this issue.

1 Tennessee, 501 U.S. 808, 824, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991); see also Ewing v.

2 California, 538 U.S. 11, 24, 123 S.Ct. 1179, 155 L.Ed.2d 108 (2003) ("A sentence can have a

3 variety of justifications, such as incapacitation, deterrence, retribution, or rehabilitation. . . . Some

4 or all of these justifications may play a role in a State's sentencing scheme.   Selecting the

5 sentencing rationales is generally a policy choice to be made by state legislatures, not federal

6 courts.").

7        Here, it is clear that petitioner's sentence does not violate the Eighth Amendment.   First,

8 petitioner's sentence does not exceed the statutory maximum for his crimes as determined by the

9 California legislature.   Petitioner's sentence of life with the possibility of parole for each count of

10 attempted willful, deliberate, and premeditated murder, plus two 20-year firearm enhancements

11 pursuant to Section 12022.53(c), was prescribed by statute.   See Cal. Penal Code §§ 664/187,

12 12022.53(c).   Second, petitioner's claim that he is entitled to leniency because no one was injured

13 in the shooting is not persuasive.   Silva and Velasquez testified that petitioner issued gang threats

14 to them, pointed a gun at them, and then fired four shots, one of which passed by Silva's ear and

15 several others that struck Silva's car.   (RT 928-38, 948, 1232-39).   The jury determined that

16 petitioner acted with the intent to kill each of them and the fact that the victims were not injured

17 or killed was simply fortuitous.   "[A] life sentence for attempted murder by use of a gun does not

18 rise to the level of an Eighth Amendment violation."   Pope v. Walker, 2012 WL 2684986, at *13

19 (E.D. Cal. July 6, 2012).   Finally, the fact that petitioner did not have a prior record does not make

20 his sentence cruel and unusual.   In fact, the Supreme Court has found that a life without parole

21 sentence for a defendant with no prior record, who committed a non-violent offense that was much

22 less egregious than attempted murder did not violate the Eighth Amendment.   See Harmelin, 501

23 U.S. at 994-96 (finding mandatory life sentence for first drug offense not grossly disproportionate

24 to the gravity of the crime).

25        For these reasons, based on its review of the record, the Court concludes that the state

26 courts' denial of this claim was not contrary to Supreme Court precedent.   Richter, 131 S.Ct. at

27 786-87.

28 **GROUND FOUR:   DESTRUCTION OF EVIDENCE**

In Ground Four, petitioner claims that he was denied his right to present a complete defense because the police impounded his car and sold it at auction before his trial, preventing him from collecting any exculpatory evidence. (Petition at 7-8).  He argues that evidence from the car could have been used to undercut Silva's identification of the car from the night of the murder. (Traverse at 20-21).

### A.   Relevant Facts

Prior to trial, petitioner filed a motion for evidentiary sanctions pursuant to California v. Trombetta, 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984), contending that the police failed to preserve evidence from petitioner's car after it was towed at the behest of police and sold at auction.  (CT 68-73).  According to petitioner, the car's gear shift was on the steering column, which contradicted Silva's testimony that the gear shift was located on the center console.  (CT 70).  Without access to the car, petitioner argued that his ability to impeach Silva was "critical[ly]" impinged.  (CT 71-72).  The prosecutor opposed the motion, noting that the car had been reported stolen in 1998 and, therefore, the legal owner of the car had been notified about the pending auction.  (CT 77-78).  The prosecutor, who had photographed the outside of the car, also argued that the inside of the car did not contain exculpatory evidence because the victim "never stated" that the transmission shifter from the shooter's car was located on the center console and that the police did not act in bad faith.  (CT 77).

The trial court held a hearing on the motion.  Petitioner argued that because the car was sold less than a month after the preliminary hearing without notification to petitioner of the pending sale the defense did not have sufficient time to collect evidence.  (Lodged Document No. 4 at 1-5).  The prosecutor responded that petitioner and his family were notified that they could not retrieve the car because it had been stolen and that the car contained no exculpatory evidence.  (Lodged Document No. 4 at 5-6).  The prosecutor told the court that Silva's testimony about the location of the gear shift "was based on his independent knowledge of those [type] of cars" and not based on his actual observation of the gear shift in petitioner's car.  (Lodged Document No. 4 at 5-6).  After hearing the arguments from counsel, the court denied the Trombetta motion.  The court found that there had been no loss of exculpatory evidence because Silva did not testify in the

preliminary hearing "that he saw the center console." (Lodged Document No. 4 at 9).  Further, the

court found that there were other ways that the defense could prove whether the car had a "center

console or [automatic] transmission."  (Lodged Document No. 4 at 9-10).  Finally, the court

determined that the police did not act in bad faith in the loss of the evidence:

> I do not believe that there is any showing that [the police] have done anything in bad faith.  The [towing] company itself found that it was a stolen vehicle, contacted the rightful owners, and based on that, the car was sold.  [¶]  I don't believe that there has been any showing that there was police action that caused that to be done.  Even if it had been caused by police action, there has been no showing of bad faith, and as such, the motion is respectfully denied at this time.

(Lodged Document No. 4 at 10-11).

## B.   Federal Law and Analysis

"The mere failure [of police] to preserve evidence which could have been subjected to tests

which might have exonerated the defendant does not constitute a due process violation." Phillips

v. Woodford, 267 F.3d 966, 987 (9th Cir. 2001) (quoting United States v. Hernandez, 109 F.3d

1450, 1455 (9th Cir.1997)).  Rather, the government's duty to preserve evidence is limited to

material evidence, the exculpatory value of which is apparent at the time of its destruction, that

is of such a nature that the defendant cannot obtain comparable evidence from other sources if

that evidence is destroyed.  California v. Trombetta, 467 U.S. 479, 489, 104 S.Ct. 2528, 81

L.Ed.2d 413 (1984).  Furthermore, "unless a criminal defendant can show bad faith on the part of

the police, failure to preserve potentially useful evidence does not constitute a denial of due

process of law." Arizona v. Youngblood, 488 U.S. 51, 58, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988).

"The presence or absence of bad faith by the police for purposes of the Due Process Clause must

necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it

was lost or destroyed." Id. at 56 n.1; United States v. Sivilla, 714 F.3d 1168, 1172 (9th Cir. 2013).

Even negligence in failing to preserve potentially useful evidence is not sufficient to constitute bad

faith and does not violate due process. Youngblood, 488 U.S. at 58; Grisby v. Blodgett, 130 F.3d

365, 371 (9th Cir. 1997); see also United States v. Flyer, 633 F.3d 911, 916 (9th Cir. 2011) ("Bad

faith requires more than mere negligence or recklessness.").

20

1    Here, the trial court found that the car did not possess any apparent exculpatory value and

2    was not of such a nature that petitioner could not obtain comparable evidence by other reasonably

3    available means.  Petitioner has not rebutted these findings with clear and convincing evidence.

4    See 28 U.S.C. § 2254(e)(1).  In any event, at trial, Silva testified that it was too dark for him to see

5    the interior of the shooter's car and that he could not tell if the car had a center console.  (RT 957,

6    973).  Thus, petitioner cannot demonstrate that, had the car been available at the time of trial, his

7    defense would have been any stronger.

8    Moreover, petitioner has offered no evidence that the police acted in bad faith in destroying

9    any evidence about the car.  In this instance, petitioner's car was sold by the towing company that

10   learned, independent of the police, that the car had been stolen and attempted to return the car

11   to the rightful owner before it was auctioned off.  The absence of any evidence that the police

12   acted in bad faith in having the car sold at auction is fatal to this claim.  See Leavitt v. Arave, 383

13   F.3d 809, 831 (9th Cir. 2004) ( "Because it is undisputed that no bad faith was involved in the

14   destruction of the possibly helpful blood samples, [petitioner] simply cannot prevail on this claim.");

15   see also Trombetta, 467 U.S. at 488 (stating that bad faith is "a conscious effort to suppress

16   exculpatory evidence"); United States v. Estrada, 453 F.3d 1208, 1213 (9th Cir. 2006) (finding no

17   bad faith because no "malicious intent" by government).

18   Petitioner also suggests that the loss of the car prevented him from testing the driver's side

19   for gunshot residue, the absence of which could have supported his claim of innocence.  (Traverse

20   at 20).  This claim fails, however, because "the value of the untested evidence is speculative."

21   Cunningham v. City of Wenatchee, 345 F.3d 802, 812 (9th Cir. 2003) (denying destruction of

22   evidence claim because there was no way of knowing whether the destroyed evidence would have

23   exonerated or incriminated the defendant); see also United States v. Drake, 543 F.3d 1080, 1090

24   (9th Cir. 2008) (rejecting Trombetta/Youngblood claim because the lost evidence "was far from

25   clearly exculpatory; indeed, it is possible that it would have further incriminated [the defendant]").

26

27

28

1    For all these reasons, based on its review of the record, the Court concludes that the state

2    courts' denial of this claim was not contrary to Supreme Court precedent.  Richter, 131 S.Ct. at

3    786-87.

4    **GROUND FIVE:      PROSECUTORIAL MISCONDUCT**

5    In Ground Five, petitioner claims that the prosecutor committed misconduct by arresting

6    petitioner's defense witnesses -- his mother and brother -- for witness intimidation before they

7    were able to testify at his trial.  (Petition at 9).  He also claims that the prosecutor and police

8    investigator improperly reviewed defense materials confiscated at the time of the arrest.  (Petition

9    at 9).  According to petitioner, there was no merit to the charges, which were brought only to

10   prevent their testimony at his trial.  (Traverse at 21-22).

11   **A.      Relevant Facts**

12   During petitioner's trial, his brother, Francisco Valadez, and mother, Marina Elbadry, were

13   arrested and charged with felony dissuading a witness for their alleged attempts to influence the

14   testimony of the prosecution's witnesses against petitioner.  (RT 1203-04).  During the arrest of

15   Valadez the police confiscated a "packet" of legal materials that Attorney Goalwin allegedly had

16   given to Valadez to give to Attorney Michaels, who was possibly substituting in as the attorney of

17   record.[6]  (RT 1205, 1211).  During an in-chambers hearing, Detective Hugo Reynaga told the court

18   that the confiscated documents included discovery materials such as police reports and

19   preliminary hearing transcripts.  (RT 1205).  Reynaga told the court that there were some notes

20   written in the margins of the transcripts, "a few" of which he had reviewed.  (RT 1205-06).  He

21   denied, however, informing the prosecutor in petitioner's case of the substance of the handwritten

22   notes.  (RT 1206).  The prosecutor corroborated that she had not reviewed any of the confiscated

23   materials and the court ordered her and Detective Reynaga not to do so in the future.[7]  (RT 1207-

24   09).

25   _____

26   [6]    Attorney Michaels represented Valadez and Elbadry in their criminal cases.  (RT 1212).

27   [7]    The prosecutor later clarified that she had seen what "appeared to be a Trombetta motion,"
but reiterated that she was "not aware of the contents of the handwritten notes" in the materials
28   confiscated from Valadez.  (RT 1214).

1    Thereafter, petitioner's counsel filed a "Notice of Motion for Dismissal or in the Alternative

2    Mistrial," alleging prosecutorial misconduct in the arrest of a material defense witness, Elbadry,

3    and perusal of petitioner's defense materials.   (Lodged Document No. 2 at 9-18).   Counsel

4    included a declaration, attesting that Valadez and Elbadry were on petitioner's witness list and that

5    the confiscated materials included his own "handwritten notes" pertaining to the case.   (Lodged

6    Document No. 2 at 11-12).   He also submitted a declaration from Attorney Michaels, who, in light

7    of the witness intimidation charges, was "advis[ing Valadez and Elbadry] to refuse to testify if

8    called upon to testify in [petitioner's] case."   (Lodged Document No. 2 at 14).

9    At the hearing on the motion, petitioner's counsel argued that petitioner's right to a fair trial

10   had been breached because his "witnesses have been made unavailable" and the prosecution had

11   improperly reviewed "[his] file."   (RT 1504, 1507).   The court took umbrage with the

12   characterization of the confiscated materials:

13           Let me stop you there, because I know that throughout this
             motion you keep saying my file, and the court has an issue with that.
14           And this is the issue.

15           First of all, according to what you have put on the record in this
             case, it was no longer your file or your discovery, or even anything
16           along those lines.   What you have said, it was given to the brother for
             purposes of being given over to another attorney.   It is not your file.
17           I need to just have this clarified, because my understanding -- and I
             am going to be looking at it here, what was recovered from [Valadez's]
18           vehicle is the police reports, the preliminary hearing transcript, as well
             as the recordings in disk form, I am assuming.
19
             And you have put on the record that whatever notes you took,
20           and what would be written in the margin you kept.   Nothing was given
             over in the way of a -- of your work product.   You're  -- just as I do,
21           and I think we put this on the record, both of us take our notes on
             legal pads, and that you have made a statement that none of your
22           notes were given over that you take as to the information in those
             cases.   The only thing, my understanding is, and that information was
23           a Trombetta motion that was started.   And as far as that goes, we did
             run the Trombetta.
24
             So when you say your file, we are talking about the discovery
25           in the case.

26   (RT 1507-08).   Nevertheless, petitioner's counsel insisted that the prosecutor and investigator

27   should not have looked at the materials "knowing" that it had come from a defense attorney.   (RT

28   1509).   The court disagreed, stating that the district attorney's office had a duty "to review the

evidence" to see if it was being used to commit the crime of witness intimidation.  (RT 1510).

Moreover, the court noted that the prosecutor had "not reviewed it" when it was discovered and

had since been ordered not to review it.  (RT 1512).  Thereafter, the prosecutor added:

> Like I said, I think I had stated on the last court date when we were here, I reviewed the items that were brought over by Detective Reynaga to see what the items contained.  I saw that there were police reports, a preliminary hearing transcript with some notes on it. I did not read the notes or know what the substance of those notes were.  [¶]  I also know there were two CDs recovered with my handwriting on it.  That is the extent of the review of the file that I did.

(RT 1513).  The prosecutor added that she had not had any contact with either of the defense

witnesses and did not order their arrest, though there was "valid evidence" that prosecution

witnesses had been "threatened" by Valadez and Elbadry.  (RT 1514-15).

Before ruling on the motion, the court went into chambers and reviewed the packet of

materials confiscated from Valadez when he was arrested.  (RT 1519-20).  After doing so, the

court told petitioner he had "reviewed every single piece of paper that was in the discovery,"

including the handwritten notes, and there was "nothing there that ha[d] any impact on

[petitioner's] case."  (RT 1520).  In fact, the court believed the confiscated documents had not

come directly from petitioner's counsel, as was alleged.  (RT 1521-22, 1525-26).  The court also

found there had been no intentional or unintentional misconduct by the prosecution.  (RT 1522,

1530-31).  Further, the court stated that neither Valadez nor Elbadry was prohibited from testifying

on behalf of petitioner and that whatever relevant testimony they could provide as character

witnesses or in support of an alibi defense for petitioner would not be impacted by their arrest.  (RT

1525).  Thereafter, the court denied petitioner's motion.  (RT 1526).  The court assured petitioner's

counsel that, if he called Elbadry as a witness in petitioner's defense, the prosecutor would be

prohibited from questioning her about her arrest for intimidating witnesses, so long as defense

counsel did not "open the door" to such testimony.  (RT 1527).

At trial, Elbadry testified that she was petitioner's mother and knew that he was right-

handed.  (RT 2120-31).  She also testified that he was working and going to school at Cerritos

College when he was arrested.  (RT 2131).  On cross-examination, she admitted that petitioner

had gotten a tattoo on his back a couple of months before he was arrested.   (RT 2131-32).
Valadez did not testify at trial.

### B.   Federal Law and Analysis

Federal habeas review of prosecutorial misconduct claims is limited to the narrow issue of whether the alleged misconduct violated due process.  See Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986).  To prevail on such a claim, a petitioner must show that the prosecutor's conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly v. DeChristoforo, 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974).  Moreover, "[o]n habeas review, constitutional errors of the 'trial type,' including prosecutorial misconduct, warrant relief only if they 'had substantial and injurious effect or influence in determining the jury's verdict.'" Wood v. Ryan, 693 F.3d 1104, 1113 (9th Cir. 2012) (quoting Brecht v. Abrahamson, 507 U.S. 619, 637-38, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993)).

Here, the trial court found that no misconduct had been committed by the prosecution because the confiscated materials had no bearing on petitioner's case and, despite being arrested, neither Elbadry nor Valadez was prohibited from testifying in petitioner's defense.  Again, petitioner has not rebutted these findings with clear and convincing evidence.  See 28 U.S.C. § 2254(e)(1).  In any event, even if the actions by the prosecutor and Detective Reynaga amounted to misconduct, it is abundantly clear from the record that there was no prejudice to petitioner.

Petitioner has made no attempt to explain how the confiscated materials from Valadez at the time of his arrest impacted his defense.  According to the record, the materials consisted of discovery materials (i.e., police reports, transcripts, and recordings) that would have been originally provided by the prosecution.  Moreover, the only hand-written notes by petitioner's counsel in the materials appear to have been notes on filing a Trombetta motion -- which had already been filed and litigated before the court.  Again, petitioner presents no evidence or argument on how the later discovery of any notes impinged his defense.

Similarly, there was no prejudice to petitioner's case from the arrest of his mother and brother for witness intimidation.  Neither witness was prevented from testifying.  In fact, Elbadry did testify in petitioner's defense, though her testimony was hardly compelling evidence of his

innocence.  Petitioner has never suggested what testimony Valadez could have given that would have aided petitioner's defense.  In light of the fact that both victims in this matter identified petitioner in a six-pack photographic lineup and at trial as being the shooter, as well as identifying his car on the night the shots were fired, it is clear that any misconduct was harmless.  See Johnson v. Sublett, 63 F.3d 926, 930 (9th Cir. 1995) (finding no prejudice from prosecutorial misconduct because "[c]onsidering the strength of the state's case" it could not have had a substantial impact on verdict); see also Brecht, 507 U.S. at 639 (holding that isolated instances of prosecutorial misconduct were harmless in light of "the State's evidence of guilt[,] [which] was, if not overwhelming, certainly weighty").  Accordingly, based on its review of the record, the Court concludes that the state courts' denial of this claim was not contrary to Supreme Court precedent. Richter, 131 S.Ct. at 786-87.

**CERTIFICATE OF APPEALABILITY**

Under Rule 11(a) of the Rules Governing § 2254 Cases, a court must grant or deny a certificate of appealability ("COA") when it denies a state habeas petition.  See also 28 U.S.C. § 2253(c).

A petitioner may not appeal a final order in a federal habeas corpus proceeding without first obtaining a COA.  See 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).  A COA may issue "only if . . . [there is] a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  A "substantial showing . . . includes showing that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'"  Slack v. McDaniel, 529 U.S. 473, 484, 120 S. Ct. 1595, 146 L. Ed. 2d 542 (2000) (citation omitted); see also Sassounian v. Roe, 230 F.3d 1097, 1101 (9th Cir. 2000).  Thus, "[w]here a district court has rejected the constitutional claims on the merits, . . . [t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  Slack, 529 U.S. at 484.

The Court concludes that, for the reasons set out above, jurists of reason would not find the Court's assessment of petitioner's claims debatable or wrong.  Accordingly, a certificate of

1  appealability is **denied**.  Petitioner is advised that he may not appeal the denial of a COA, but he
2  may ask the Ninth Circuit Court of Appeals to issue a COA under Rule 22 of the Federal Rules of
3  Appellate Procedure.  <u>See</u> Rule 11(a), Rules Governing § 2254 Cases in the United States District
4  Court.

**VI.**

**<u>ORDER</u>**

For the foregoing reasons, IT IS HEREBY ORDERED that Judgment is entered denying
and dismissing the Petition with prejudice.  A certificate of appealability is also denied.

DATED: March 20, 2015

_____
PAUL L. ABRAMS
UNITED STATES MAGISTRATE JUDGE